UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

DAVID G. CHASE,

        Plaintiff,

    v.                                  Case No. 08-C-0386

MICHAEL J. ASTRUE,
Commissioner, Social Security Administration,

        Defendant.

---

## DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER AND DISMISSING CASE

        Plaintiff, David G. Chase, filed this action seeking judicial review of the final decision of the Commissioner of the Social Security Administration denying his applications for Disability Insurance Benefits ("DIB") under Title II and Supplementary Security Income ("SSI") under Title XVI of the Social Security Act ("Act"). At the outset, Chase alleged disability commencing July 31, 2001, due to an ulcer on his right big toe, but later amended the onset date to December 9, 2002. After his applications were denied initially and upon reconsideration, Chase requested a hearing.

        Chase appeared with an attorney for the June 14, 2007, hearing during which a vocational expert testified. On September 27, 2007, the Honorable Robert G. White (ALJ) issued a decision finding Chase not disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

1

*Plaintiff's Testimony*

At the time of the Agency's final decision, Chase was forty-four years of age. (R. 4, 80.)  He had a seventh grade education and past work experience in construction as a general laborer.  (R. 72–75, 89, & 292.)  According to Chase, he sustained a crush injury to his right foot ten years ago, which he believes engendered a neuropathy.  (R. 156, 286.)  Later, while at the beach, Chase cut his right great toe on an object and developed a recurrent ulcer on it.  (R. 29, 130–72, 200, 279.)  The record establishes that the ailment existed for years and that doctors told Chase to stay off of his foot and to keep it elevated. (R. 89.)  Although Chase indicated that he stopped working as of July 31, 2001, he worked periodically as a construction/day laborer.  (R. 89, 191, & 197.)

Chase testified that he could not perform sedentary work because swelling would occur if his foot was not elevated.  (R. 295–96.)  He further testified to living alone, performing household chores sitting on a stool, and having his mother doing his grocery shopping and his laundry.  (R. 286–87.)

*Medical Evidence*

Chase's ulcer was first medically diagnosed on June 7, 2002.  (R. 200.)  His physician referred him to a foot care clinic.  (R. 131.)  At the clinic, Dr. Lin confirmed that Chase had a one centimeter ulcer on "the plantar surface of his right hallux" (i.e., right big toe).  (R. 131.)  Dr. Lin determined that Chase should be non-weight bearing on his "right lower extremity" and that he should begin therapy at the Wound Care Clinic.  (R. 131.)

Chase attended therapy at the Wound Care Clinic from December 2002 to April 2003, which led to an overall improvement in the size and healing of the ulcer.  (R.

130, 136–44.)  On January 20, 2003, doctors at the foot care clinic noticed improvements in the ulcer and advised Chase to continue weekly therapy at the Wound Care Clinic.  (R. 130.)  Chase did not return to therapy at the Wound Care Clinic until February 19, 2003, which he explained was due to issues with his health insurance coverage.  (R. 139–40.) In April of 2003, he was discharged from the Wound Care Clinic on account of truancy and failure to reschedule appointments.  (R. 136, 143.)  Upon re-examination at the foot care clinic on April 14, 2003, Chase's ulcer was found to be "healing well" and Chase was advised to continue therapy at the Wound Care Clinic.  (R. 129.)

On October 24, 2003, Chase reported to his physician that his right toe ulcer began to worsen six weeks earlier.  (R. 197.)  Chase noted that his toe had become red and swollen once he returned to construction work two weeks ago.  (R. 197.)  At this examination, the doctor found that Chase's ulcer showed erythema and tenderness but did not show evidence of osteomyelitis.  (R. 197, 207.)  The doctor treated the ulcer with Cipro and referred Chase back to the Wound Care Clinic.  (R. 197.)  On a follow-up examination on November 7, 2003, the doctor found Chase's toe had improved and referred him back to the foot care clinic.  (R. 196.)

In February of 2004, Chase saw his physician, Dr. Bandi, and complained of ulcer pain in his right big toe.  (R. 192–93.)  After examination of the ulcer, Dr. Bandi issued a letter stating that Chase would be unable to work until the ulcer healed.  (R. 152.)  One year later, in February 2005, Chase again complained to his doctor of ulcer pain after returning to work.  (R. 191.)  At this visit, the doctor noted an ulcer of three centimeters in size with edema and erythema, prescribing that Chase take antibiotics and seek special treatment at a vascular clinic.  (R. 190.)

3

Chase did not report to the vascular clinic until May of 2005, claiming that insurance issues had impeded him. (R. 189–90.) On May 13, 2005, Chase met with Dr. Towne, a vascular surgeon, and complained of ulcers on both the left and right big toes. (R. 236–38.) Upon examination of the right foot, Dr. Towne found that Chase did not have diabetes, he did have significant neuropathy therein, and he had a three centimeter ulcer on his right big toe. (R. 236.) As for the left foot, the doctor found only a callus on the left big toe. (R. 237.) Dr. Towne placed Chase's right foot in a special boot and applied SoloSite to the ulcer. (R. 236). On June 3, 2005, Dr. Towne noted that Chase's ulcer on his right big toe had significantly improved. (R. 233.)

On June 22, 2003, Dr. Baumblatt, a state agency physician, reviewed Chase's medical record and opined that he could perform the full range of sedentary work. (R. 30, 165–72.) Dr. Chan, another state agency physician, reviewed Chase's medical record on September 27, 2005, and confirmed that Chase could perform the full range of sedentary work. (R. 29, 165–72.)

On October 14, 2005, Dr. Towne noted that Chase's ulcer was clean but did not believe that Chase could do "meaningful manual labor at this point" and supported Chase getting disability benefits. (R. 227.) He also stated that Chase said he did not have the resources to get special orthopedic shoes, so he would try to place Chase in an orthopedic brace. (R. 227.) Dr. Towne advised Chase to return in one month for a follow-up. (R. 227.) Chase did not see Dr. Towne again until March 17, 2006, reporting that he had no pain, swelling, or other changes in the ulcer on his right big toe. (R. 225–26.) Two months later, on May 26, 2006, Dr. Towne found no change since the previous March appointment and encouraged Chase to stay off of his right foot. (R. 222.) During his

4

evaluation of June 23, 2006, Dr. Towne saw some improvement in the ulcer, which he attributed to Chase taking better care of his foot. (R. 219–20.)

In October of 2006, Chase underwent four days of inpatient treatment for cellulitis of the right toe. On admission to the treatment center, Chase was feverish, had swelling of the foot, and experienced pain throughout his right leg. (R. 239–45.) Apart from these symptoms, Chase said he did not have any difficulty walking. (R. 239–45.) On October 27, 2007, Dr. Towne stated that the cellulitis was resolved and that Chase's ulcer was stable. (R. 216.)

On February, 16, 2007, Dr. Towne reported that Chase's ulcer was at least fifty-percent healed and that Chase was doing well. (R. 213). At the same time, Dr. Towne indicated in writing that Chase should not work until his ulcer healed, which he believed would not occur for the "foreseeable future." (R. 184.) In March of 2007, Chase's foot was still continuing to improve with no odor, edema, or warmth. (R. 210.) Thereafter, on May 23, 2007, Chase reported high pain in both big toes. (R. 209.) Upon examination, the right toe ulcer had an odor and mild drainage, but no erythema, warmth, or edema; whereas, the left toe had only a callous. (R. 209.)

On June 13, 2007, Dr. Towne wrote a letter responding to Chase's attorney's inquiry regarding whether or not Chase's impairment met a regulatory definition for a listing under the Act. (R. 253–54.) In this letter, Dr. Towne stated that Chase's prior crush injury led to the neuropathic ulcer on his right big toe, which he believed satisfied the soft tissue injury listing definition. (R. 253–54.) Furthermore, on June 25, 2007, Dr. Towne responded to another letter from Chase's attorney that requested him to elaborate on Chase's condition. (R. 255.) In that reply, Dr. Towne stated that failure for the ulcer to

5

heal was a "poor predictor for future improvement." (R. 255.) He also recommended that if Chase worked in a seated position, then Chase should elevate his right lower extremity to at least 90 degrees. (R. 255.)

*Hearing Testimony*

At the administrative hearing on June 14, 2007, the vocational expert testified that there would be sedentary, unskilled jobs in the economy that allowed individuals to miss twelve days of work per year for medical reasons. (R. 287–98.) Additionally, the vocational expert stated that these sedentary jobs would allow a leg elevation to 20 degrees for medical purposes, but would not allow a hip-level elevation. (R. 298.)

*ALJ's Decision*

The ALJ found that Chase met the disability insured status requirements for the Social Security Act through September 30, 2004, and that Chase had the severe impairment of a right great toe ulceration. (R. 9–10.) Moreover, the ALJ determined that Chase's impairment did not meet or equal a medical listing under the Act. (R. 10–11.) Additionally, the ALJ concluded that Chase had a Residual Functional Capacity (RFC) to perform the full range of sedentary work; that Chase should be allowed to elevate his right foot 15 to 20 degrees while seated at a sedentary job; that Chase should be allowed to miss work once a month for medical purposes; that Chase had no "past relevant work"; and that jobs existed in the national economy for Chase, given his career profile and medical needs. (R. 11–16.) Thus, the ALJ held that Chase was not disabled under the Social Security Act at any time from December 9, 2002 (amended onset date) through September 27, 2007 (date of ALJ's decision). (R. 17.)

STANDARD OF REVIEW

A district court's review of a social security appeal is limited to determining whether the ALJ's decision is supported by substantial evidence and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, re-weighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir.1998). However, "[i]n coming to his decision . . . the ALJ must confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir.2003). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Scheck*, 357 F.3d at 699. Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

Additionally, the ALJ's decision must demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). While the ALJ need not discuss every piece of evidence in the record, he must provide at least a glimpse into his reasoning. *See Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded. *See Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351 (7th Cir. 2005); *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003); *Zurawski*, 245 F.3d at 889.

Importantly, the ALJ must utilize a five-step sequential process in determining whether or not a claimant is entitled to DIB or SSI. 20 C.F.R §§ 404.1520(a) & 416.920(a)

7

(2009). To prevail, the claimant must show: (1) he is not presently employed; (2) he has a severe impairment; (3) his impairment is not listed or equal to a listing in 20 C.F.R. § 404, Subpart P, App. 1; (4) he is unable to perform his past relevant work; and (5) he is unable to perform any other work within the economy. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997). Moreover, if steps one and two are satisfied, the ALJ must predicate his disability determination on finding a medical listing (step three), if applicable, or on finding an insufficient RFC (steps four and five). *See*, *e.g.*, *Scheck*, 357 F.3d at 700. In the case at bar, the ALJ properly found that Chase met the first two steps of the Social Security Regulations. (R. 9–10.) Therefore, this court reviews the ALJ's decision that Chase was not per se disabled under the listings or the RFC requisites.

## ANALYSIS

Chase advances two theories for the reversal or remand of the ALJ's decision. First, that the ALJ erred in his evaluation of the listings. Second, that the ALJ determined the RFC improperly. Each theory is addressed below.

With respect to Chase's first theory, he argues that the ALJ relied on the state agency physicians' opinions improperly, and that the ALJ was neither qualified to nor did he evaluate the medical evidence relevant to listings as required. Upon reviewing the ALJ's careful listings discussion against the record, the court finds neither to be a viable ground for disturbing the ALJ's determination. The ALJ was correct in his identification and evaluation of the listings that Chase claimed were substantiated by medical evidence. Particularly, he found that Chase's ulcer did not meet the criteria of Listing 1.08 (Soft-tissue Injuries) due to his apprehension that the great toe qualified as a "lower extremity" under the definition, together with the fact that Chase could still "effectively ambulate." (R. 10.)

8

Also, he found that Chase's impairment did not equal: Listing 8.04 (Deep Mycotic Infections), because comparable impairments are irresponsive to prescribed treatment, whereas the record showed that Chase's ulcer improved when he followed the doctors' orders; Listing 11.14 (Peripheral Neuropathy), because Chase had neuropathy in only one "extremity" and not both as required; and Listing 9.08A (Diabetic Neuropathy), because Chase was not diagnosed as diabetic. (R. 10–11.) The ALJ's analysis, though concise, was sufficiently detailed and responsive.

Notwithstanding Chase's arguments to the contrary, the ALJ may rely on the opinion of state agency physicians in determining listings. SSR 96-6p; *see Scott v. Sullivan,* 898 F.2d 519, 524 (7th Cir. 1990). Further, a Disability Determination and Transmittal Form (Form SSA-831) filled out by a state agency physician "*conclusively establishes* that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck*, 357 F.3d at 700, (citing *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989)) (emphasis added); *cf.* SSR 96-6p. State agency experts, Dr. Baumblatt and Dr. Chan, reviewed Chase's medical records and filled out Forms SSA-831, finding him not disabled per a listed impairment. (R. 29, 30.) Hence, the ALJ gave due deference to the "conclusive" findings of the state agency physicians on this issue.

In addition, this Circuit has held that a state agency doctor's completion of Form SSA-831 is sufficient proof of an apposite listings evaluation. *See Fox v. Heckler*, 776 F.2d 738, 742 (7th Cir. 1985); *see also Scheck*, 357 F.3d at 700. Pursuant to these authorities, Dr. Baumblatt and Dr. Chan's reports addressed the listings issue adequately, despite the absence of a lengthy, explicit comment.

Chase would discredit the state agency physicians' reports because they were "terribly out of date" and failed to consider the more recent medical evidence from treating physician, Dr. Towne. (Pl.'s Reply Br. at 7.) In support of this claim, he cites *Whitney v. Schweiker*, 695 F.2d 784, 789 (7th Cir. 1982), and *Garrison v. Heckler*, 765 F.2d 710, 712 (7th Cir. 1985), for the proposition that a state agency doctor's assessment of medical equivalence does not constitute substantial evidence, and has less weight than a treating physician's later evaluation that states otherwise. *Id.* However, Chase misreads *Garrison*, which pursuant to the Supreme Court's decision in *Richardson v. Perales*, 402 U.S. 389 (1971), cabins the application of *Whitney*'s principles. "The preference for the views of the treating physician [over the state agency physician] discussed in . . . *Whitney*," holds the *Garrison* court, "applies only when ability to observe the claimant over an extended period is essential to an accurate understanding." *Garrison*, 765 F.2d at 715. The facts of this case do not warrant an extension of *Whitney*'s principles as specified in *Garrison*.

In any event, the reviewing doctors' assessments in June and September 2005 were "well after Plaintiff's alleged onset date and during a time when Plaintiff's relevant medical care for his toe ulcer had been characteristic of his overall course of treatment." (Def.'s Mem. at 14.) Because the record reflects that Chase's impairment as of June and September 2005 closely parallels its status as of June 2007, this court finds that a complete longitudinal history of his impairment was not essential for an accurate understanding of his medical equivalence. Consequently, *Whitney* does not apply here, and the reports of the state agency physicians are not obsolete for failure to consider Dr. Towne's later opinion.

Chase's arguments regarding the ALJ's qualifications and evaluations of the medical evidence relevant to the listings fail as well. Regulations and case law make clear that the question of medical equivalence is a legal inquiry reserved for the ALJ's resolution. *See* SSR 96-6p; *see also Denton v. Astrue*, 596 F.3d 419, 424 (7th Cir. 2010). The ALJ acted according to his vested authority to weigh evidence and determine listing equivalence. That a claimant must meet *all* of the specified medical criteria is clear. "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (no emphasis added). And, the claimant bears the burden to "present medical findings equal in severity to *all* the criteria" specified by a listing. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002) (quoting *Sullivan v. Zebley*, 493 U.S. at 530–31) (no emphasis added).

The ALJ has the prerogative to determine if this burden is satisfied. *See* § 416.926(e) ("For cases at the administrative law judge . . . level, the responsibility for deciding medical equivalence rests with the administrative law judge . . . ."). In explaining this determination, the ALJ need only build "a bridge from the evidence to his conclusion." *Sims*, 309 F.3d at 229 (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000)). Given the limited scope of review in these matters, a district court may only evaluate the process directing ALJ determinations—not the determinations themselves. *See Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir.1998).

Here, the ALJ considered Chase's evidence on medical equivalence properly, inasmuch as he reviewed such evidence and explained duly why he found it unpersuasive. (*See generally* R. 10–11.) Given this level of consideration, the record supports a finding that the ALJ constructed a "bridge" between the evidence and his result. The court also

recognizes a fortiori that the ALJ's determination gains credibility from the medical opinions of Dr. Baumblatt and Dr. Chan, who did not find a listing was equaled upon review of the medical evidence at that time. (R. 29, 30.) In light of these factors, it is apparent that substantial evidence supports the ALJ's denial of a medical equivalence finding.

Turning now to Chase's second theory for reversal or remand, the court holds that the ALJ's RFC determination was valid procedurally and backed by substantial evidence. Chase purports that the RFC determination was flawed inasmuch as the ALJ made: (1) an improper credibility determination of plaintiff's testimony; (2) improper inferences from plaintiff's failure to follow prescribed treatment; and (3) improper assessments of the medical evidence from the treating source and other experts.

The ALJ assessed adequately the credibility of plaintiff's statements on the limiting effects of his impairment's for purposes a RFC determination. A credibility determination of an ALJ is "entitled to special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (2004). In making a credibility determination, the ALJ must consider five factors: (1) claimant's daily activity; (2) duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Compare Scheck*, 357 F.3d at 703 (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)), *with* SSR 96-7p (enumerating seven factors). However, an ALJ need only "minimally articulate" his reasons for a disability determination, and need not discuss every piece of evidence. *See Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988).

In the instant case, the ALJ acknowledged Chase's descriptions of his impairment, stating he "accepts that the claimant's condition does have a significant effect

12

on his ability to function," but despite such subjective statements, "a careful review of all of the evidence, *including testimony at the hearing*, shows that claimant's limitations do not interfere with his functioning to the degree required . . . for a finding of 'disability.'" (R. 16 (emphasis added).) Further, the ALJ reasoned that Chase's testimony loses credibility because: Chase could still "ambulate effectively," according to the medical record; Chase sat comfortably at the ALJ hearing;[1] Chase failed to comply with prescribed treatment more than once (*see infra*); and Chase performed manual labor in the past, notwithstanding his injury. *Id.* The ALJ's comments were sufficient to comport with the SSR 96-7p and the *Polaski* requisites for a credibility determination, and were consistent with his duty to minimally articulate his rationale. Accordingly, the court finds that the RFC calculation suffers from no procedural defect in this regard.

Next, Chase submits that the ALJ proceeded inappropriately by drawing negative inferences from Chase's failure to follow prescribed treatment in violation of SSR 82-59, as he had financial hardships which excused him from following prescribed treatment under that ruling. (Pl.'s Br. 8–11.) However, this provision does not apply to Chase's case. SSR 82-52 applies only to individuals with a "disabling impairment" that precludes them from engaging in any substantial gainful activity. *See* SSR 82-52; *see also* 20 C.F.R. §§ 404.1530 & 416.930. It was not found that Chase qualified as disabled

---

[1] Chase charges the ALJ with affording excessive and unjustified weight to his observation of Chase at the hearing. (Pl.'s Br. at 6–7; Pl.'s Reply Br. at 2.) However, it is fitting that an ALJ make such observations in determining credibility. SSR 96-7p ("In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements."); *see also Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) (noting the importance of ALJ's observations at hearings). After reviewing the ALJ's opinion, it is apparent to this court that the ALJ did not base his RFC determination solely on his observations as charged by Chase, but rather that he weighed them against record evidence from physicians, a vocational expert, and Chase. (R. 11–18.) Therefore, Chase's concern is unwarranted.

13

pursuant to medical equivalency or that his impairment prevented him from performing substantial gainful activity. (R. 10, 17.) Moreover, the court agrees with defendant's reading of the ALJ's opinion as "primarily consider[ing] Plaintiff's lack of follow-through with recommended treatment as one factor in evaluating his credibility," and not indicating that SSR 82-52 applies. (Def.'s Mem. at 18 n.3.) Chase, despite his citations to non-binding authority for support (Pl.'s Reply Br. at 4–5), misinterprets SSR 82-52 and the ALJ's opinion. For that reason, the ALJ's RFC determination cannot be impeached pursuant to this ruling.

Finally, in determining Chase's RFC, the ALJ properly evaluated the treating source and other expert medical evidence correctly. A treating source is entitled to controlling weight so long as it is not "inconsistent" with substantial record evidence. *See* SSR 96-2p; *accord Schaff v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). This Circuit has recognized the treating physician's temptation to embellish functional limitations to help patients obtain DIB and SSI, suggesting that such pressures have a place in an ALJ's RFC determinations. *See Scheck*, 357 F.3d at 702 ("[A] personal physician 'might have been leaning over backwards to support the application for disability benefits.'") (quoting *Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982)).

Chase contends that the ALJ violated SSR 96-2p by rejecting Dr. Towne's June 25, 2007, letter regarding his functional capacity. However, this is simply incorrect. In that letter, Dr. Towne (who rendered this opinion at the request of Chase's attorney) stated that Chase needed to keep his foot elevated at ninety-degrees. (R. 14, 255.) The ALJ found this particularly suspicious because the letter was written after the vocational expert testified at the hearing that there would be no sedentary jobs in the national

14

economy which would allow Chase to elevate his right foot to ninety degrees. (R. 14–18, 298.) In addition, Dr. Towne's statement that Chase "elevate his right lower extremity while seated" was written in the absence of medical evidence in the record recommending that Chase elevate his foot. (R. 14–15.) Notwithstanding his concerns about the procurement of Dr. Towne's post-hearing letter, the ALJ did not reject it categorically during his RFC inquiry. Instead, he evaluated its merits and discredited it as too impersonal and inconsistent with other medical record evidence. (R. 14–16.) To reverse the ALJ's decision for how he weighed Towne's June 25, 2007, post-hearing letters would be a transgression of this court's reviewing powers, given that the ALJ followed proper protocol in handling the treating source's evidence. Thus, the court finds that the ALJ's RFC determination is not invalid on the alleged procedural grounds as Chase asserts. Now, therefore,

IT IS ORDERED that the Commissioner's decision is affirmed.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 29th day of July, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

15